THE ÆTNA MILL AND ELEVATOR COMPANY, *Appellee,*
v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY
COMPANY, *Appellant.*

No. 17,838.

SYLLABUS BY THE COURT.

SPECIAL FINDINGS — *Inconsistent and Erroneous — Damages —
Extraordinary Floods.* Special findings of fact returned by
the jury examined and held to be inconsistent and erroneous,
to the prejudice of the defendant's substantial rights.

Appeal from Sumner district court. Opinion filed
March 8, 1913. Reversed.

*William R. Smith, Owen J. Wood,* and *Alfred A.
Scott,* all of Topeka, for the appellant.

*Ed T. Hackney,* of Wellington, for the appellee.

The opinion of the court was delivered by

BURCH, J.:    The plaintiff sued the defendant for
damages resulting from the flooding of its mill on the
night of June 28, 1908. The claim was that the defend-
ant did not provide sufficient openings through its
grades and beneath its tracks for the water of Hargis
creek, a small stream from ten to twenty feet wide,
with banks from four to six feet high, which flows from
north to south through the city of Wellington. The
defense was that the flood was caused by a cloud-burst,
was so extraordinary and unprecedented that it ought
to be designated as an act of God, and consequently
that the defendant was not responsible for its ravages.
The plaintiff recovered and the defendant appeals.

The flood was the most disastrous in the history of
the stream. Within a remarkably short time twelve
inches or more of rain fell and the valley of the stream
was immediately filled with a torrent of water which
carried destruction and devastation in its wake.
Bridges over the creek were washed away, fences, tele-

graph poles and telephone poles were swept down, trees were uprooted, and buildings were engulfed before their occupants could escape. Houses were swept from their foundations and carried downstream and dashed against the railway bridge before the inmates could be rescued. Several lives were lost, many people were rendered homeless, stock was drowned, and much property was destroyed. Indeed, the flood was quite unprecedented in all its aspects unless it be with respect to the height to which the water rose. Some witnesses thought that the Jackson flood, which occurred in 1876, before the railway was built, rose higher. Others were of a different opinion, and numbers of witnesses, including several old settlers, testified that the flood of 1908 was the highest ever known. A flood known as "the cyclone flood" accompanied the tornado which visited Wellington in 1892, but the water at that time was from twenty-two inches to two feet lower than in 1908.

At the time of the flood in 1908, three of the defendant's tracks crossed Hargis creek. The northernmost one is called the mill track, the next one is called the main-line track, and the southernmost track is called the Hunnewell branch track. The Hunnewell branch track is not important to a consideration of the case. Bridges were maintained for the mill track and the main-line track over Hargis creek and over "A" street, which is a street of the city of Wellington lying east of the stream and running north and south. Bridge number 254 is the main-line track bridge across "A" street. In 1887, when the railroad was first built, the length of this opening was 30 feet. It was increased to 58 feet in 1898 and to 66 feet in 1902, at which length it remained at the time of the flood. Bridge numbered 255 is the main-line track bridge across Hargis creek. The length of this opening was 30 feet in 1887. It was increased to 56 feet in 1898 or 1900 and was 56 feet long at the time of the flood. Bridge

254-A is the mill track bridge across "A" street. In 1887 it was 96 feet long. It was reduced to 94 feet in 1890 and was further reduced to 74 feet in 1903, at which length it remained at the time of the flood. Bridge number 255-A is the mill-track bridge across Hargis creek. In 1887 the length of this opening was 176 feet. In 1898 it was reduced to 167 feet and in 1903 it was further reduced to 84 feet, which was its length at the time of the flood. The "A"-street bridges afforded outlets for the water of the creek whenever it overflowed its banks. The creek frequently overflowed at times of heavy rain, but the bridges described took care of all flood waters previous to 1908, including the cyclone flood of 1892. At that time the total length of all the openings was 330 feet. In 1908 the total length was 280 feet, a net reduction of 50 feet. The plaintiff, of course, made much of this reduction, while the defendant maintained that it was the result of prudent engineering in the light of all the factors of the drainage problem.

The plaintiff's mill was situated about 400 feet east and about 800 feet north of the "A"-street bridge. One of the plaintiff's chief witnesses testified that on the night of the flood the creek was 1000 feet wide and from 12 to 13 feet deep from the bottom of the channel, at a point 3000 feet north of the railway tracks. The fall of the stream was about twelve and one-half feet to the one-half mile. If the character of this flood was such that the defendant could not reasonably anticipate it, or if, notwithstanding the inadequacy of the defendant's waterways, the flood was of such a character that the plaintiff would nevertheless have suffered, the defendant was not responsible in damages for what occurred.

In order to develop the facts showing the peculiar character of the flood and the relation of the defendant's bridges to it, the jury were requested to answer a large number of special questions, and the manner in

which they dealt with these questions is important. Certain of them, with the answers returned, follow:

"Question 5-A. What was the area of the opening of defendant's bridge 255-A up to elevation 86.0 at time of flood in question? Answer. Don't know.

"Question 6-A. Was the area of the opening of bridge 255-A up to elevation 86.0 two hundred and twenty square feet? Answer. Approximately, yes.

"Question 14-A. Was the storm and flood of June 28, 1908, what is known as an act of God? Answer. No.

"Question 15-A. Was the storm and flood of 1908 in question what is commonly known as a cloud-burst or water-spout? Answer. No.

"Question 16-A. Did the flood down Hargis creek June 28, 1908, come in waves or walls of water several feet high, short intervals apart? Answer. We think not.

"Question 17-A. Did the bridges and waterways in defendant's railroad at the places in question prove sufficient for all waters that had come down Hargis creek prior to the flood of June 28, 1908. Answer. They had been sufficient prior to change of bridge and building fill for new tracks.

"Question 20-A. Was there from twelve to fifteen inches of water that fell along Hargis creek on the night of June 28, 1908? Answer. The exact amount of inches unproved.

"Question 21-A. If you answer 'No' to the last question, then state what was the greatest amount of water that fell, in the region of Hargis creek on the night of June 28, 1908? Give it in inches. Answer.

———.

"Question 19. Do you find, as testified to by several, that ten to twelve inches of water fell in the region of Hargis creek, north of Wellington, on the night of June 28, 1908? Answer. Yes.

"Question 21. Were there dead bodies of different animals taken from a flood that came down Hargis creek on the night of June 28, 1908? Answer. No evidence.

"Question 22. What was the greatest number of inches of rain fall that occurred at any point within

8 miles of Wellington on the night of June 28, 1908? Answer. Not proven.

"Question 30. Was there about 12 inches of rain fell at Hargis creek on the night of June 28, 1908? Answer. Yes.

"Question 32. Did flood waters fall on Hargis creek and come down on the city of Wellington on the night of June 28, 1908, in waves 1 to 3 ft. high, so suddenly that much property and a number of lives were lost in and near Wellington before relief or assistance could be given? Answer. Yes.

"Question 33. Were there trees of considerable size washed loose and carried down the flood in Hargis creek on the night of June 28, 1908? Answer. No evidence.

"Question 36. How often, if ever, before June 28, 1908, did so large a volume of water flow down Hargis creek into the city of Wellington as the volume that came down on the evening and night of June 28, 1908? Answer. Once.

"Question 37. Give the dates that a volume of water came down Hargis creek into Wellington as large or larger than the volume that came down on the evening or night of June 28, 1908? Answer. The Jackson Flood in 1876 or '77.

"Question 39. Was the water in Hargis creek valley as it passed over the land of C. G. Epperson, who testified as a witness in this case, higher during the storm of 1908 than it was at the time of the cyclone storm in 1892? Answer. Yes.

"Question 40. If you answer the last interrogatory in the affirmative, state how much higher? Answer. About two [twenty] or twenty-two inches.

"Question 41. How far north of the mill track on the Santa Fe was the C. G. Epperson place where it crossed Hargis creek valley? Answer. Between ½ and ¾ miles."

Findings 5-A and 6-A cancel each other. The jury say they don't know and that they do know. Besides this, there was no controversy over the area of the opening inquired about. It was shown to be about 230 square feet by a map, with sectional drawings, which was introduced in evidence and which the plaintiff

admitted to be correct and to show truthfully the things it purported to show. The controversy arose over the size of these openings, and the findings relate to a fundamental fact in the case.

Findings 16-A and 32-A cancel each other. The jury say the flood did not come down in waves of water at short intervals, and that it did come down suddenly in waves of water from one to three feet high. The manner in which the flood came down the valley was a fact of the highest importance, and a number of eyewitnesses graphically described the movement of the water.

Finding 20-A is evasive and untrue. The jury were not asked for the exact number of inches, but were asked whether or not twelve to fifteen inches of rain fell along the creek, and in findings 19 and 30 they were able to fix the quantity at about twelve inches. The question bore directly upon the subject of whether or not the flood was an act of God.

The answer to question 22 is untrue. Finding 30 establishes the fact that about twelve inches of rain fell, and if that was the greatest quantity the jury should have so answered. If it were not, the jury should have given the greatest quantity. The witness Metcalf, living four miles northeast of Wellington and two miles west of Hargis creek, testified that from eighteen to twenty inches of water fell, measured in a forty-gallon barrel which was empty before the rain. The witness Geuch, living about two miles from the headwaters of Hargis creek, testified that two candy buckets sixteen inches deep were filled and ran over, and that he never saw or heard of a storm of like proportions. The witness Frambers, living four miles northeast of Wellington and one-half mile from Hargis creek, testified that from twelve to fourteen inches of water fell the night of the flood. He had lived there about seventeen years and had never seen any flood nearly so large. The witness Hummel, living three and

one-quarter miles north of Wellington and three-quarters of a mile from Hargis creek, testified that the rain filled an empty half-bushel. How much ran over he did not know, but his judgment was that from twelve to fifteen inches of water fell. He described the storm as a waterspout. He had lived in the neighborhood for twenty-six years and had never before seen such a flood. Other witnesses described the storm as a cloud-burst. Perhaps if the true answer had been given to the question it would have conflicted with findings 14-A and 15-A, that the storm was not what is commonly known as a cloud-burst or waterspout, and that the flood was not an act of God.

Finding 33 is untrue. The witnesses Lawrence, Jackson, Rothrock, Covell and Shoemaker all gave evidence upon the subject. Standing trees were uprooted, swept away, and some of them carried through the defendant's bridges. These witnesses all regarded the storm as unprecedented and no witness in the case described any other storm in the history of the stream which descended so suddenly and so violently. One of the plaintiff's principal witnesses testified as follows:

"I was at the Antlers Hotel sitting up until the storm was over, and some fellow came along and said the creek was up and I immediately went down to the creek. I went down on East Harvey street. I don't think the water raised very much after I got there, a couple of feet perhaps. It possibly might have been going on probably fifteen or twenty minutes before I got there. I did not see walls of water coming down. These houses that were washed away and demolished were the first houses that the stream met I presume. I think there were no houses north of there. The flood rain must have happened along about ten o'clock. I got down somewhere about half past ten. The flood waters came right around about eleven. When I got down there the stream was up almost to the eaves of some of the houses. That all happened from between nine and ten o'clock up to between ten and eleven."

While the answer to question 21 is perhaps technically correct, the evidence was that domestic animals were washed away and were drowned in the flood. There was testimony that one man lost sixteen head of horses and a witness said that he tried to reach one or two dead horses and two dead cows to get them out of his way while he was working in the flood.

The answer to question 17-A is clearly evasive. It related to a fact bearing directly upon the question of the defendant's foresight and care. If it had been candidly answered the answer would have been distinctly favorable to the defendant, because the evidence was that the defendant's bridges had safely taken care of all flood waters which came down the creek prior to 1908.. As it stands the answer is equivocal, because a number of changes were made at different times in the bridges and in the grades for new tracks.

The answer to question 40 depended upon the tesimony of C. G. Epperson, who was referred to in question 39. He testified that the flood of 1908 was from 22 to 24 inches higher than the cyclone flood and that he had made measurements which enabled him to give his evidence. The jury arbitrarily pared down his figures two inches. Apparently, however, the jury readily accepted the testimony of the plaintiff's chief witness that the flood of 1876 was higher than that of 1908, although the marks by which his judgment was guided left a margin of uncertainty of five feet as to the height of each flood.

Several other answers show the unwillingness of the jury to make fair findings of facts established by the evidence which would have been favorable to the defendant.

The findings of the jury were duly attacked, and relating as they do to material questions in the case, they were highly prejudicial to the defendant.

The defendant requested the following instruction:

"4. Even if you should find that the defendant failed

to provide for the passage of waters passing down Hargis creek at the time in question and that such failure constituted negligence on the part of the defendant, yet if you further find that the flood was caused solely by what is known in law as an 'act of God,' and would have caused the plaintiff to have sustained the loss in question regardless of defendant's care or want of care and foresight in the constructions and maintenance of its road across Hargis creek and at the places in question, then you should find for the defendant; as in such case the loss would be the result of an act of God and not the result of the negligence of the defendant."

The instruction stated the law and no equivalent for it was given. Indeed, the jury was in effect instructed to the contrary in the second paragraph of instruction numbered 12, which reads as follows:

"The defendant is not liable for what is commonly known as an act of God, by which is meant those events and accidents which proceed from natural causes and which can not be anticipated, guarded against or resisted.

"For losses occurring by any of these means the defendant is not liable, provided it has not been guilty of any want of ordinary or reasonable care to guard against such loss."

The effect of instruction 12 is that the defendant is not liable for events which can not be anticipated or guarded against at all, unless he has been guilty of want of reasonable care to anticipate or guard against them. While these instructions did not affect the verdict because the jury found the flood was not an act of God, the subject may become important at another trial.

Because of the inconsistencies and errors in the findings of fact, the judgment of the district court is reversed and the cause is remanded for a new trial.